```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

JANE CONSOLIE,                      :
     Plaintiff,                     :
                                    :    Case No. 3:05cv1021 (JBA)
v.                                  :
                                    :
WAL-MART STORES, INC.,              :
     Defendant.                     :
```

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 29]**

After being fired from her job at Wal-Mart Stores, Inc. in March 2004, Jane Consolie initiated this action in Connecticut superior court. Defendant Wal-Mart timely removed via 29 U.S.C. § 1441, invoking this Court's diversity jurisdiction, 28 U.S.C. § 1332. Ms. Consolie presses claims of libel, slander, breach of implied contract, intentional infliction of emotional distress, and retaliatory discharge in contravention of Title VII.[1] Wal-Mart now moves for summary judgment on all five counts of plaintiff's complaint [Doc. # 1]; for the reasons that follow, its motion will be GRANTED.

I. Background

In February 2001, Ms. Consolie was hired as a licensed optician, an at-will "associate" position, in the Northborough, Massachusetts Wal-Mart store. She was provided with and, on February 24, 2001, affirmed reading and understanding the

---

[1] Ms. Consolie has dropped her claim of Title VII gender discrimination, Pl.'s Memo Opp. Summ. Judg. [Doc. # 37] at 3-4.

1

Associate Handbook ("Handbook"), which instructs employees to "[a]lways conduct yourself in a professional manner," reminds them that "taking anything, large or small, is dishonest," that "[a]ll Company supplies, property, and facilities should be used for Company business only and should not be used for personal gain;" and that profanity "has no place at work" and "will not be tolerated." (Handbook Acknowledgment, Def. Ex. 7.)

Around December 1, 2001, plaintiff was promoted to the position of Vision Center Manager at the North Windham, Connecticut store. Michelle Sullivan was Ms. Consolie's supervisor, but in the event Sullivan was unavailable, Consolie was to report to Roger Noll, Store Manager of the North Windham branch. Ms. Consolie had gone through two management training programs before this point, was told by District Vision Center Managers Larry Clayman and Gerry Hutnak that she would receive additional training to be successful in her new role, and was sent by Sullivan to at least two managerial training seminars. However, Ms. Consolie claims that she was denied the opportunity to attend training on shrinkage ("shrink school"), which is defined as "merchandise or dollars that can't be accounted for" in the Handbook. In 2002 and 2003, plaintiff received favorable reviews and annual raises. In that time period, the annual performance reviews by vision center managers in plaintiff's district were conducted by two managers in a hotel room; Ms.

2

Consolie alleges that she made her unease with this arrangement known at her 2004 evaluation, which was held in a conference room instead. She also claims having complained to District Manager Curt Jones in early 2003 that Noll exhibited disrespect towards the Vision Center by saying that it "should be closed" and replaced instead by a "pet store." (Pl. Emails, Pl. Ex. L.) On November 13, 2003 and January 5, 2004, plaintiff sent emails to Regional Vice President Jon Sims that Noll had denied her request to display Vision Center Christmas merchandise and had "embarrassed and harassed" her for taking leave over the holiday. (Id.)

In December 2003 Ms. Consolie sent personal mortgage documents using Wal-Mart's Airborne Express account, billing to defendant the amount of $4.87. Ms. Consolie did not receive permission to use Wal-Mart's account for personal purposes, and although Consolie represents that she intended to repay the charge incurred by defendant, she did not reimburse Wal-Mart during her employment. Also in December 2003, plaintiff requested and obtained four $25 Wal-Mart gift cards from the North Windham store's cash office, charging the sum to the store's Associate Relations Fund. Ms. Consolie contends that she gave these cards as "rewards" to her employees, while defendant characterizes them as personal gifts. Wal-Mart policy requires managers to obtain approval of employee rewards over $50 from the

District Manager, Store Manager, or Store Co-Manager. (Noll Dep., Pl. Ex. E, at 55.) Ms. Consolie reasoned that since each card was for $25, she needed no approval. Ms. Consolie did not reimburse Wal-Mart for the gift cards during her employment.

Lance Sovine officially became Vision Center District Manager with responsibility for the North Windham store in February 2004, and investigated plaintiff's use of the air bill and gift cards in early March 2004. The fact of this forthcoming investigation was not discussed at Ms. Consolie's annual review in February 2004, conducted that year in a conference room instead of a hotel room. At that review, plaintiff thanked Sovine and Regional Vision Center Manager Kristina ("Tina") Frank for the change of venue.

When Sovine visited the North Windham Vision Center on March 5, 2004, he spoke with Vision Center associate Jay Vaid, who reported Consolie's use of the air bill and gave him the actual bill. (Sovine Aff., Pl. Ex. D, ¶¶ 6, 7.) Vaid reported the air bill incident to Noll, as well. (Noll. Dep., Pl. Ex. E, at 35-36, 44-45, 85.) Vaid also provided Sovine with a written statement that Consolie had called him an "Indian giver," called associate Jenilu Zboray "fu_k_ing Retarded," and referred to another associate as "The FU_K_ng Cunt" in conversation with Vaid and associate Melissa Dumont. (Vaid Statement, Def. Ex. I-1.) Ms. Consolie admits having used foul language and having used the

term "Honest Injun" in the presence of Vaid, who is of Indian descent, Def.'s Mot. for Summ. Judg. Ex. A [Consolie Dep.] at 101:14-102:9, 113:14-115:9.

On March 5 and 6, 2004, plaintiff attended two closed-door meetings with Sovine, Assistant Manager Sue Kennedy, and District Loss Prevention Supervisor Gary Stevens at which the air bill, gift cards, and foul language were discussed. Plaintiff admitted in writing that she used the air bill for personal purposes. (Pl. Statement, Def. Ex. A-4.) Stevens's termination recommendation was approved by Regional Vision Center Manager Frank, and Ms. Consolie was discharged on March 6, 2004. Consolie was required to reimburse defendant for the costs of the air bill and gift cards. All of this was summarized in a Recovery of Associate Restitution ("ROAR") entered on March 6, 2004 by Stevens:

> I was notified on 3/6/2004 by Vision Center DM Lance of a problem with vision Centr [sic] manager Jane Consolie. Jane had apparently used Wal-Mart money to pay for an Airbourne Express shipment to send loan papers to a bank. Jane also gave her associates $25.00 shopping cards as a Christmas gift and paid for them out of the store. . . . . I also asked Jane about bringing merchandise into the vision center that was not paid for. Jane said she did that many times, but is sure she paid for everything before it left the store. I advised this was also against company policy. Jane agreed she did not follow policies. Jane wrote an admission statement. Jane was terminated from Wal-Mart, but was not trespassed from Wal-Mart property. Jane repaid the $100. shopping cards and $4.87 for the Airbourne Express shipment.

(ROAR Report, Def. Ex. B-1.)

Plaintiff grieved her termination immediately after she was fired. (Pl. Dep., Def. Ex. A, at 163-65.) In the course of the grievance investigation, vision center employee Melissa Dumont wrote an email, dated March 19, 2004, confirming Vaid's account of plaintiff's language, adding that Consolie "would say f---, s---, a--hole," referred "to [another vision center associate] as stupid, idiot," and "made reference to me about being Hispanic." (Dumont Email, Def. Ex. G-5.) Ms. Consolie's termination was upheld on or about March 19, 2004, and she was at that time advised that the Wal-Mart computer system's Personnel Change Notification ("PCN") code reflecting the "Supervisor's Justification" for plaintiff's termination was "Theft of Company Assets" and "Documented Profanity Towards Associates on the Sales Floor." The PCN codes ultimately reflected that plaintiff's termination was based on foul language and gross misconduct, and not theft. (Sovine Dep., Pl. Ex. D, at 143.)

II. Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment "bears the burden of

establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). The duty of the court is to determine whether there are issues to be tried and in making that determination, the Court must draw all factual inferences in favor of the party opposing the motion, viewing the factual disputes among materials such as affidavits, exhibits, and depositions in the light most favorable to that party. See Phaneuf v. Fraikin, 448 F.3d 591, 595 (2d Cir. 2006). "If reasonable minds could differ as to the import of the evidence . . . and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted).

"A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex v. Catrett, 477 U.S. at 324 (1986)). The non-moving party, in order to defeat summary judgment, must then come

7

forward with evidence that would be sufficient to support a jury verdict in his or her favor, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986), not merely "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

III. Discussion

    A.   Slander (Count One) and Libel (Count Two)

Ms. Consolie first alleges that defendant defamed her verbally (slander) and in writing (libel) by describing the reasons for her termination. The allegedly slanderous statements occurred during the two meetings between Consolie and supervisors Sovine, Kennedy, and Stevens on March 5 and 6, 2004, during which those present discussed Ms. Consolie's job performance. At the March 5th meeting, Sovine said to plaintiff in front of Assistant Manager Kennedy, "[y]ou have merchandise in the Vision Center that is unpaid for," and "[y]ou have no integrity and no business being a Vision Center Manager" (Pl. Dep. I, Def. Ex. A, at 132:20-133:9). At the March 6th meeting, Stevens said to plaintiff in front of Kennedy and Sovine, "[b]ecause of the gift cards and foul language you are being terminated for personal use of company assets" (id. at 268).[2] The claimed libelous

---

[2] While there is some equivocation on plaintiff's part in the record, she testified that the statement "We're going to Loss Prevention," which was uttered by Sovine to plaintiff on March 6, 2004 in front of Kennedy and Stevens, is not the basis for her defamation claim. (See Pl. Dep. I, Def. Ex.

8

statements are the PCNs stating that plaintiff was terminated for "Gross Misconduct (Integrity Issue) (78)," containing the "Supervisor's Justification" of "Theft of Company Assets" and "Documented Profanity Towards Associates on the Sales Floor." (PCNs, Def. Exs. G-4, G-5.)

Defamation is proved by evidence of an unprivileged communication of a false statement which tends to either harm the reputation of another by lowering him or her in the estimation of the community or deter others from dealing or associating with him or her. Woodcock v. Journal Publishing Co., 646 A.2d 92, 105 (Conn. 1990). Oral defamation is "slander," while written defamation is "libel." Gagnon v. Housatonic Valley Tourism Dist. Comm'n, 888 A.2d 104, 114-115 (Conn. App. Ct. 2006). A prima facie case of defamation – whether slander or libel – requires proof that: 1) defendant published a defamatory statement, 2) to a third person, 3) which identified plaintiff, and 4) caused injury to plaintiff's reputation as a result. Cweklinksy v. Mobil Chemical Co., 837 A.2d 759, 763-64 (Conn. 2004).

Wal-Mart argues that the statements in question are privileged,[3] and thus fail as a matter of law to constitute defamation. At one time, defamatory statements contained within

---

A, at 268.)

[3] While plaintiff claims that defendant waived its defense of qualified privilege by not pleading it in the Answer, the Court notes that it was in fact pled as the "Thirteenth Defense." (See Ans. [Doc. # 9] at 6.)

9

intracorporate communications were not deemed to have been "published," see, e.g., Abrahams v. Young & Rubicam, 793 F. Supp. 404 (D. Conn. 1992) (statements made in intracorporate communications "are, by definition, non-public statements published in confidential memoranda or uttered between and among [defendant managers] alone and thus cannot appropriately comprise libelous or slanderous forms of speech"); however, the Connecticut Supreme Court has specifically abandoned that approach. Torosyan v. Boehringer Ingelheim Pharm., Inc., 662 A.2d 89, 103 (Conn. 1995). Rather, oral or written publication notwithstanding, "communications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege," id.[4] The privilege's protections are defeated only where the alleged defamer made her or his statement with "actual malice — that is, with knowledge of its falsity or reckless disregard as to its truth," id. at 104.

The oral and written statements Consolie attacks are similar to those at issue in Torosyan in that they were made in connection with explaining the reason for termination. The oral statements of Stevens and Sovine were made during closed-door meetings with plaintiff and her supervisors to discuss her job

---

[4] The Connecticut Supreme Court has extended the Torosyan privilege to "employment references of current or former employers that were solicited with the employee's consent," Miron v. Univ. of New Haven Police Dept., No. SC 17596 (Conn. Sep. 18, 2007).

10

performance and violations of company policy.  The PCN
statements, accessible only by human resources staff (see
Johannesen Aff., Def. Ex. G, ¶ 14; PCNs, Def. Exs. G-3, G-4),
function as the electronic equivalent of a managerial memorandum
or letter in an employee's personnel file documenting the reasons
for a change in status.  See, e.g., Rogus v. Bayer Corp., No.
02cv1778 (MRK), 2004 U.S. Dist. LEXIS 17026, at *33-34 (D. Conn.
Aug. 25, 2004) (finding letters placed in plaintiff's personnel
file on reasons for termination to be protected by qualified
privilege).  Thus, both the PCN statements and the statements
made by Stevens and Sovine constitute intracorporate business
communications relative to employee performance and termination
to which qualified privilege applies.

The only inquiry remaining, then, is whether Ms. Consolie
presents evidence from which it can be inferred that these
statements were made with actual malice.  Malice has been found
to exist where an employer makes a statement whose truth he or
she doubts, see Torosyan, 662 A.2d at 102-04, or where the
accused defamers lacked information to support the statements
they made and failed to obtain plaintiff's side of the story
before making the statements, Blake-McIntosh v. Cadbury
Beverages, Inc., No. 96-CV-2554, 1999 U.S. Dist. LEXIS 12801, at
*26-27 (D. Conn. June 25, 1999).  Here, Wal-Mart claims that Ms.
Consolie lacks any evidence that Stevens's and Sovine's oral

statements or the electronic PCNs were tainted by malice.  When Sovine said "[y]ou have merchandise in the Vision Center that is unpaid for," he had earlier that day gone to the North Windham store and did not further pursue the issue when Consolie denied having any.  (See Pl. Dep., Def. Ex. A, at 132-33.)  Plaintiff, when asked if she had "any reason to believe that [Sovine] did not believe it at the time he made the statement," replied, "I don't know what he believed."  (Id. at 258-59.)  The fact that Sovine had investigated this claim, that he dropped the issue when plaintiff gave her explanation of the circumstances of her possession of the Ensure, and that plaintiff makes no claim that Sovine's comment was made with reckless disregard of the truth, all demonstrate lack of actual malice on Sovine's part with no evidence to the contrary.

Similarly, there is no evidence showing that Stevens's statement to plaintiff – that her termination was on account of the gift cards/personal use of company assets and foul language – was made with actual malice.  Stevens's uncontroverted testimony was that he learned about the gift cards and foul language incidents from Lance Sovine on March 5, 2006, and that he uttered his explanatory remarks to Ms. Consolie in front of managers Sovine and Kennedy in the context of carrying out her termination.  (Stevens Dep., Def. Ex. B, at 65.)  His verbal explanation was restated in the ROAR Report prepared later that

12

day, March 6, 2004.  From none of this undisputed account could a reasonable juror find malice.  Similarly, since the record contains no evidence beyond plaintiff's acknowledgment of use of "foul language," Stevens's comment, which is addressed neither in Stevens's deposition excerpts nor his declaration (see Def. Exs. B, H), appears to be based on what he learned from Sovine, who had been told as much firsthand by Vision Center associate Vaid (see Vaid Decl, Def. Ex. I; Vaid Statement, Def. Ex. I-1).  Ms. Consolie proffers no evidence disputing that Stevens made this statement in good faith.  Absent any evidence of malice in these managers' termination-related communications, Wal-Mart is entitled to summary judgment on the basis that the challenged statements were privileged as a matter of law.

    B.    <u>Breach of implied contract (Count Four)</u>

In the fourth count of her complaint, Ms. Consolie claims that Wal-Mart promised her training, specifically that supervisor Sullivan promised to "have someone come to the store and help me train," but that this never happened.  (Pl. Dep. I, Pl. Ex. A, at 440.)  Wal-Mart contends that it was a general promise not specifying any type of training, or if an implied contract, that Wal-Mart fulfilled it by the training which was provided to Ms. Consolie.

To prove the existence of an implied contract, one "must

show by a preponderance of the evidence that the other party
agreed, either by words or actions or conduct, to undertake
[some] form of actual contract commitment." Cweklinsky v. Mobil
Chem. Co., 364 F.3d 68 (2d Cir. 2004) (internal citations and
quotations omitted). Absent any other form of express mutual
assent, a court may find the existence of an implied contract
where "the parties, by their conduct, recognized the existence of
contractual obligations," Janusauskas v. Fichman, 826 A.2d 1066,
1073 (Conn. 2003). The conduct requirement is crucial to
demonstrating mutual assent because "[a] contractual promise
cannot be created by plucking phrases out of context; there must
be a meeting of the minds between the parties." Christensen v.
Bic Corp., 558 A.2d 273, 277 (Conn. App. Ct. 1989).

Here, on the record presented, Ms. Consolie fails to adduce
sufficient evidence of the existence of an implied contract to
survive summary judgment. She bases her claim on the generalized
statements of her supervisor, but makes no showing that Wal-Mart
intended itself to be bound to contractual obligations – as by,
for instance, subsequent conversations about her training
progress – and does not even describe the putative obligations
with any specificity.[5] On evidence this gossamer, it is

---

[5]  Q: Did [Wal-Mart] make any specific representations to you
        about what type of training or the amount of training?

    A: They just said training.

Consolie Dep. at 120:5-8.

14

appropriate to grant summary judgment in favor of defendant on Ms. Consolie's breach of implied contract claim.

    C.   <u>Intentional infliction of emotional distress (Count Five)</u>

Next, Ms. Consolie contends that Wal-Mart intentionally inflicted emotional distress on her in the circumstances surrounding her termination--namely, that she was "intimidated" and "threatened" when terminated and told by Stevens that she would be "trespassed," or barred, from the store, causing her to believe she "might be arrested." (Pl. Dep. I, Pl. Ex. A, at 67; Pl. Dep. II, Pl. Ex. A, at 5.)[6] According to Consolie, she was so fearful that "she sent her son away" and is still being treated by psychotherapist Marlene Heald, who testified that plaintiff perceives "the firing and the mode and manner of the firing" as "very traumatic." (Heald Dep., Pl. Ex. N, at 38-39.) Yet plaintiff also testified at her deposition that "everybody was very calm" and comported themselves professionally during the March 6, 2004 meeting at which she was terminated (Pl. Dep. I,

---

[6] In Connecticut, an intentional infliction of emotional distress claim requires proof of four elements: "(1) that the [defendant] intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Carrol v. Allstate Ins. Co., 815 A.2d 119, 126 (Conn. 2003). To be liable for intentional infliction of emotional distress, the defendant's conduct must be more than insulting, hurtful, or socially undesirable; it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id.

15

Def. Ex. A, at 250-51). The basis for her fear of arrest is not demonstrated by the record, particularly as she admits she was permitted to freely leave the room during the March 6 meeting (Pl. Dep. II, Def. Ex. A, at 29), and was permitted to "ask[] [Stevens] about going to the Vision Center and getting my belongings. . . . I was told that I was not banned from the store. I could go up there and freely get my items . . . [Stevens] thanked me for a file I gave him" (Pl. Dep. I, Def. Ex. A, at 250) (emphasis added).

Based on Ms. Conslie's testimony about the circumstances of her termination and the conduct of her supervisors, she has offered no evidence of conduct which reasonable jurors could find outrageous or atrocious, and summary judgment on this count will be granted.

### D. Retaliation in violation of Title VII

In her remaining claim, Ms. Consolie alleges that she was terminated in retaliation for "making comments about defendant's hotel room policy," (Compl. at ¶ 48). The "hotel room policy" refers to Wal-Mart's decision to hold Ms. Consolie's annual performance review in the hotel rooms of visiting regional supervisors in 2002 and 2003. Ms. Consolie alleges that she felt unnerved by the hotel room setting, and asked for a change of venue.

Under Title VII, it is unlawful for an employer to take retaliatory action against an employee because the employee "has opposed any practice made an unlawful practice by this subchapter," i.e. workplace discrimination. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of employment discrimination, a plaintiff must show "(1) participation in a protected activity that is known to the defendant, (2) an employment decision or action disadvantaging the plaintiff, and (3) a causal connection between the protected activity and the adverse decision," Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 443 (2d Cir. 1999).

If done in good faith, "an internal complaint to company management" protesting the allegedly-discriminatory actions of a supervisor constitutes protected activity for Title VII purposes, Kotcher v. Rosa & Sullivan Appliance Ctr., 957 F.2d 59, 65 (2d Cir. 1992)(internal quotation omitted). The third element is satisfied when a Title VII plaintiff "demonstrate[s] that the causal connection between the defendant's action and the plaintiff's injury is sufficiently direct," Gierlinger v. Gleason, 160 F.3d 858, 872 (2d Cir. 1998). On the adverse action prong, it is undisputed that Ms. Consolie was fired.

Ms. Consolie puts much stock in two words allegedly uttered at the end of her February 2004 performance review. While prior performance reviews had been held in the hotel rooms of traveling

17

regional supervisors during 2002 and 2003 – a setting potentially unsettling to an opposite gender employee – Wal-Mart staged Ms. Consolie's 2004 review in a conference room. Although plaintiff posits in her opposition brief that Slovine's response to her thanking them for moving the venue of the performance review indicates his acknowledgment of her prior complaints about the practice of holding reviews in hotel rooms,[7] the evidentiary record pinpoints the timing of her protected activity, for which she attributes her termination as retaliatory, as occurring during the 2004 review:

> Q: Did there come a time when you raised concerns about [the hotel room] practice?
>
> A: Yes.
>
> Q: When was that?
>
> A: The only one that I can absolutely say was when at my [2004] review with Lance Sovine and Tina Frank I thanked them for putting us in a more professional atmosphere.
>
> [....]
>
> Q: You had never raised this with anybody prior to that review in February of 2004? . . . It was some time <u>after your review</u>?
>
> A: (Witness moved head up and down.)

---

[7] When plaintiff thanked Tina Frank and Lance Sovine for taking reviews out of hotel bedrooms Mr. Sovine responded You're Welcome [sic] . . . If defendant had not changed its practice as a result of plaintiff's complaint, why would Mr. Slovine respond "you're welcome."

Pl.'s Opp. to Summ. Judg. at 12, 13.

18

Consolie Dep. at 53:15-22 (emphasis added).  Further confounding her retaliation claim and contradicting her briefing argument is plaintiff's answer when asked whether Mr. Sovine or Ms. Frank "made any response" to her remark about a more professional atmosphere: "[n]one whatsoever."  Consolie Dep. at 54:21-22.

From this record, a jury would be asked to infer both that her complaint about the prior settings for reviews, occurring under circumstances where the subject of the complaint had already been remedied, was viewed by defendant as protected activity, and/or, given the post-hoc character of the implicit complaint, that it had a causal relationship with the decision to terminate her.  Simply put, no reasonable juror could make such findings on this evidence.  Accordingly, summary judgment will be entered on this claim for the defendant.

IV. Conclusion

For the foregoing reasons, defendant Wal-Mart's motion for summary judgment [Doc. # 29] is GRANTED.  The Clerk is directed to close the case.

IT IS SO ORDERED.

/s/

JANET BOND ARTERTON, U.S.D.J.

Dated at New Haven, Connecticut, this 27th day of September, 2007.